**Carmen CHAFINO, Appellant,**

v.

**Ismael CHAFINO, Appellee.**

No. 08–06–00200–CV.

Court of Appeals of Texas,
El Paso.

June 28, 2007.

---

John Gates, El Paso, for appellant.

John P. Mobbs, El Paso, for appellee.

Before CHEW, C.J., McCLURE, and CARR, JJ.

## OPINION

KENNETH R. CARR, Justice.

This is an appeal from the trial court's division of community property incident to divorce. Appellant Carmen Chafino ("Carmen") contends the trial court abused its discretion in its community property division and by failing to award her spousal maintenance. For the reasons that follow, we affirm.

1. The couple were married for thirty-seven years. Ismael was sixty-five years old and Carmen, sixty-three, at the time of trial. The couple had four children. One of their three sons was killed in a drive-by shooting several

## FACTUAL AND PROCEDURAL BACKGROUND

Carmen and Ismael Chafino ("Ismael") were married in El Paso, Texas on June 8, 1968.[1] Carmen filed for divorce on August 4, 2004, alleging insupportability, adultery, and cruel treatment. *See* Tex. Fam.Code Ann. §§ 6.001, 6.002, 6.003. Ismael filed a general denial and a counter petition for divorce on August 25, 2004, also alleging insupportability and cruel treatment. The couple were divorced on July 18, 2005, at the conclusion of a bench trial. The final divorce decree, with property division, was entered on June 5, 2006.

Both spouses worked outside the home during the marriage. Ismael was a food inspector for the United States Department of Agriculture, but he planned on retiring within a year of the divorce. Carmen worked for forty-two years as a certified bookkeeper. Carmen was retired at the time of trial. Carmen managed the family's finances during the marriage. Ismael described himself as a "stranger" to the family's financial situation.

At the time of trial, the community estate contained a number of real and personal property assets. The couple's marital home, known as 10716 Janway, had an appraised value of $115,000, and a $53,744.62 mortgage. Ismael testified that he thought the property was worth between $120,000 and $125,000. The couple owned a rental property, known as 1052 Francine, which had appraised value of $43,000, and no outstanding mortgage. The couple also owned two unimproved lots, one known as the "Timberon lot,"[2]

years before the divorce. The couple's other three children were all adults at the time of the divorce.

2. Timberon is a hamlet located in Otero County, New Mexico.

and another in Clint, Texas, known as the "Clint lot." [3]

The couple also had retirement and savings assets. Carmen's retirement account with Vanguard (the "Vanguard account") was valued at $84,766.68 at the time of the divorce. Ismael's retirement savings, including an account with the Federal Employees Retirement System (FERS) and an additional thrift savings plan, totaled over $80,000.[4] There were also three certificates of deposit. The first CD, with Wells Fargo Bank (the "Wells Fargo CD"), had a face value of $23,000, but it was encumbered by a $16,800 debt.[5] The second CD, with State National Bank (the "State National CD") was in Ismael's name and was worth $3,081.01, according to an account statement dated February 11, 2003. On the one hand, Ismael testified that, at the time of the divorce, the State National CD had been cashed in and no longer existed, although he did not cash it in himself and did not know how the money had been spent. On the other hand, he testified that the State National CD had a balance at the time of trial, but that the money belonged to his eighty-one-year-old mother. Ismael continued by stating that his name was only on the account so that he could make withdrawals

on his mother's behalf, to provide for her needs. Ismael also testified that the third CD, with Chase Bank (the "Chase CD"), was for his mother's benefit, specifically to pay for funeral expenses. The CD had a value of approximately $6,000 at the time of trial. Carmen testified that the State National and Chase CDs were funded by savings bonds for which she and Ismael had saved together. She also testified that Ismael had the bonds sent to his mother's address and "just got upset" when she asked him why he was having the bonds sent to his mother's address.

The final community assets were household furnishings, electronics, and other items of personal property, which are not valued in the record, as well as three cars, a 1994 Lincoln Town Car, a 2002 Buick Century, and a 1984 Honda Accord. The Lincoln had an estimated value of $1,500. The Buick had an estimated value of $8,000, but was subject to a loan almost equal to its value. The Honda Accord was not running and was worth approximately $500.

In addition to the debts discussed in relation to the community assets, the couple also had outstanding balances on seven retailer-specific, and several other general, credit cards.[6] The community estate had

---

3. According to Carmen's proposed property division, the Clint lot was appraised for $12,500, and the Timberon lot, for $3,500. According to Ismael's testimony at trial, the Clint lot was worth approximately $22,000, and the Timberon lot, approximately $20,000.

4. Ismael estimated that his FERS account was worth approximately $65,000 at the time of trial. Ismael's thrift savings account had a balance of between $25,000 and $30,000, but was encumbered by an $8,500 loan.

5. The Wells Fargo CD was the result of a withdrawal Carmen had made from her retirement account. According to Ismael's testimony, Carmen borrowed money, using the CD as collateral, by forging his signature on

the loan documents. The couple had an outstanding federal income tax debt of $13,397.34 from penalties related to the conversion. According to Carmen's testimony, she converted the funds in order to borrow money to pay off the mortgage on the Francine rental property and to pay off another debt related to a scholarship fund the family attempted to create for local high school students in their son's memory. Some of the funds were also used to pay a medical bill Carmen incurred when one of her physicians would not accept her medical insurance.

6. The credit card accounts and balances included: Visa, with a $6,500 balance; Capitol One, with a $250 balance; Citibank, with a $2,981 balance; Sam's, with a $250 balance;

a variety of medical debts due to Carmen's health problems, totaling $1,642.49. Carmen testified that the couple also owed money to HFC for a line of credit on which they had drawn for a variety of expenses over many years. At the time of the divorce, the outstanding debt to HFC was $7,548.

Carmen testified that she filed for divorce, in part, because of Ismael's extramarital behavior.[7] Throughout discovery and at trial, Ismael denied having committed adultery. The trial court saw videotaped evidence and heard eyewitness testimony from two people on the issue of his infidelity. Private investigator Raul Acosta produced videotape evidence and testified that he witnessed Ismael having an affair with a woman named Rosa Rubalcaba. According to Acosta, Ismael met with Rubalcaba on several occasions. Sometimes they would remain in the vehicle for extended periods of time "showing their affection." On June 2, 2005, Acosta witnessed and videotaped Ismael and Rubalcaba rent a room at a Motel 6 on the eastbound side of Interstate 10. Acosta explained that the pair arrived at the motel in Ismael's government car at 3:50 p.m. and stayed there for approximately three hours and twenty minutes. Rubalcaba was also called to testify about her relationship with Ismael. She admitted that she and Ismael had had sexual relations at the motel on June 2, 2005, and on one other occasion. She also testified that she did not know that Ismael was married, until she received the summons to testify at trial.

Acosta also videotaped Ismael visiting the home of another woman, Rosanna Bringas Torres, on several occasions, late into the evening. Acosta attempted to serve a subpoena on Bringas Torres, but he was unsuccessful, and she did not testify at trial.

The trial court entered its property division order on June 5, 2006. Each spouse was awarded the personal belongings and finances in his or her sole control or possession, as well as his or her own individual retirement account(s). Ismael was awarded the Buick and the Honda automobiles, as well as the State National and Chase Bank certificates of deposit. He was also awarded a State National Bank savings account, his tools, a steel cabinet, a few of his deceased son's possessions, and a few other personal possessions. The court ordered that the Clint and Timberon lots be sold and the proceeds applied to the couple's outstanding tax debt, with any remaining proceeds split evenly. The remainder of the community assets, including both houses, were awarded to Carmen.

The trial court ordered Ismael to pay the balances on the Sears and Capitol One

---

Talbot's, with a $475 balance; Foley's, with a $245 balance; Dillard's, with a $840 balance; Mervyn's, with a $317 balance; J.C. Penney, with a $140 balance; and Sears, with a $6,885 balance. There was also a $703 balance on a loan from Wells Fargo Bank, which Carmen testified she used to pay a physician to remove a tumor from her back. Ismael testified that he had not known about the loan and that Carmen had forged his signature on the loan documents.

7. Carmen alleged that Ismael had been having adulterous affairs for many years. She testified summarily that she believed the af-

fairs began only a few years into the marriage. The trial testimony includes evidence from two witnesses that Ismael committed adultery after the couple separated in May 21, 2004, but before the divorce decree. Our discussion will focus on the evidence from these two witnesses. However, the record also contains evidence of a previous incident when the couple visited with a church official regarding a card Ismael had received from another woman. In the card, the woman professed her love for Ismael; there is, however, no direct evidence that he carried on an affair on this prior occasion.

credit cards, the HFC debt, and the thrift savings account loan. Carmen was ordered to pay the Janway mortgage, the remainder of the credit card debt, and her own medical bills.

Carmen brings two issues. In Issue One, she asserts that the trial court abused its discretion in the property division, by failing to award her a greater portion of the community estate. In Issue Two, she contends that the trial court erred by failing to award her spousal maintenance. Finding no error, we affirm.

## DISCUSSION

In Issue One, Carmen asserts that the trial court abused its discretion, because the final divorce decree is not a fair and equitable apportionment of the community estate.

■ "Most of the appealable issues in a family law case are evaluated against an abuse of discretion standard, be it the issue of property division incident to divorce or partition, conservatorship, visitation, or child support." *Garcia v. Garcia,* 170 S.W.3d 644, 648 (Tex.App.-El Paso 2005, no pet.). An abuse of discretion is not determined according to whether the reviewing court would have decided the issues in the same way as the trial court, but whether the trial court acted without reference to any guiding rules and principles. *Id.* at 649 (citing *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 242 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986)). In other words, the appropriate inquiry is whether the ruling was arbitrary or unrea-

sonable. *Id.* When, as in this case, we do not have the benefit of the trial court's formal findings of fact and conclusions of law, we will presume that the trial court made all findings necessary to support the judgment. *See id.* at 648.

■ Carmen argues that Ismael's adultery and his continual denials thereof during trial entitle her to a larger proportion, so that the trial court's division was an abuse of discretion.[8] The Texas Family Code gives the trial court broad authority to divide the marital estate in a manner it deems just and right. TEX. FAM.CODE ANN. § 7.001. The reviewing court should correct a property division only in a case where the trial court clearly abused its discretion, by ordering a division that was manifestly unjust or unfair. *See O'Carolan v. Hopper,* 71 S.W.3d 529, 532 (Tex. App.-Austin 2002, no pet.); *In re Marriage of Taylor,* 992 S.W.2d 616, 620 (Tex.App.-Texarkana 1999, no pet.). We employ a two-pronged analysis in such a review: (1) Did the trial court have sufficient information upon which to exercise its discretion? and (2) Did the trial court abuse its discretion by making a property division that was manifestly unjust or unfair? *Evans v. Evans,* 14 S.W.3d 343, 346 (Tex.App.-Houston [14th Dist.] 2000, no pet.).

■ It is the reviewing court's duty to presume that the trial court properly exercised its discretion in dividing the estate. *Burney v. Burney,* 225 S.W.3d 208, 215 (Tex.App.-El Paso 2006, no pet.). Therefore, the burden of demonstrating that the trial court's division was an abuse of discretion belongs to the party challenging

---

**8.** Carmen asserts that Ismael perjured himself in written discovery and during trial by continuing to deny his extramarital relationships in the face of two eyewitnesses. Under Texas Law, perjury is a criminal offense. *See* Tex. Penal Code Ann. §§ 37.02, 37.03. There is no evidence that Ismael was criminally charged for his testimony. In any case, as the fact finder herein, the trial court was the sole judge of witness credibility and the weight to be given testimony, so it had authority to disregard all or parts of Ismael's testimony, as it saw fit. *See Dubree v. Blackwell,* 67 S.W.3d 286, 289 (Tex.App.-Amarillo 2001, no pet.).

the division. *Id.* at 215. We defer to the trial court's determination on witness credibility and will disturb the trial court's findings only in a case of a clear abuse of discretion. *Id.*

■■■■■ Community property need not be divided equally, but the division must be equitable. *See Kimsey v. Kimsey,* 965 S.W.2d 690, 704 (Tex.App.-El Paso 1998, pet. denied). The trial court's discretion in making the division, while broad, is not unlimited; the court must have a reasonable basis for an unequal division of the community estate. *See Zieba v. Martin,* 928 S.W.2d 782, 790 (Tex.App.-Houston [14th Dist.] 1996, no writ). The trial court may consider a variety of factors, including: (1) the spouses' capacities and abilities; (2) benefits which the party not at fault would have derived from the continuation of the marriage; (3) business opportunities; (4) relative physical conditions; (5) relative financial conditions; (6) disparity of ages; (7) size of separate estates; (8) the nature of the property; and (9) disparity of earning capacity. *Murff v. Murff,* 615 S.W.2d 696, 699 (Tex.1981); *Garcia,* 170 S.W.3d at 653. In a fault-based divorce, the court may also, in making a disproportionate division, consider the conduct of the errant spouse. *Ohendalski v. Ohendalski,* 203 S.W.3d 910, 914 (Tex. App.-Beaumont 2006, no pet.).

■■■■ Ismael's apparent adulterous behavior and his consistent denials thereof provided the trial court with a reasonable basis for making an unequal property division in Carmen's favor. Ismael, however, is not challenging the court's division in Carmen's favor; instead, Carmen argues, in essence, that the court abused its discretion by not making the division even more unequal than it did and that she is entitled to still additional property.

■■■■ It is the parties' responsibility to provide the trial court with a basis upon which to make the division. *Burney,* 225 S.W.3d at 215. The party complaining of the trial court's division must be able to show from the evidence in the record that the division was so unjust and unfair as to constitute an abuse of discretion. *Id.* The record in this case shows that Carmen requested the trial court to award her the following assets: the house at 10716 Janway, the rental property at 1052 Francine, the Clint and Timberon lots, the Lincoln Town Car, the Honda Accord, the Vanguard retirement account, and the Wells Fargo certificate of deposit, containing the converted section 401(k) retirement funds. According to her evaluation of the estate, these assets comprised approximately 70 percent of the total community assets.[9]

The final divorce decree differs from Carmen's proposed property division only in the disposition of the Clint and Timberon properties and the inoperative Honda Accord. In Carmen's proposal, the real properties would have been awarded entirely to her, and there is evidence that she intended to sell them both. She also did not receive the twenty-one-year-old Honda, which she admits in her proposed division was worth only $500.

In the final divorce decree, the trial court ordered the two lots to be sold and the proceeds used to pay the couple's outstanding federal income tax debt, after which any remaining proceeds would be split evenly between the parties. Ismael

---

9. Carmen's proposed division would also have allocated the following community debts to her proportion of the estate: the Janway property mortgage, six credit card accounts, her outstanding medical bills, and the outstanding loan with Wells Fargo Bank. According to Carmen's calculations, these debts represented approximately 65 percent of the total community debt.

received the Honda Accord. Carmen does not express how these two alterations to her proposed division rendered the trial court's decision an abuse of discretion. Nor does she explain what assets she did not receive which, had they have been awarded to her, would have made the division equitable. She only argues that Ismael's behavior entitled her to a greater proportion of the community estate. We are unpersuaded by her argument.

■■■ An unequal property division may not be used to punish the party at fault in the divorce. *Ohendalski,* 203 S.W.3d at 914. While Ismael's conduct, both in and out of the courtroom, may well have provided the trial court with a reasonable basis for awarding an unequal property division in equity, Carmen is not entitled to additional assets to punish her former spouse for his behavior. *See Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex. 1987), *overruled on other grounds, Price v. Price,* 732 S.W.2d 316, 319–20 (Tex.1987) (husband's fault and greater income were only two of the factors to be considered in making property division and trial court did not abuse its discretion in dividing estate evenly between the parties). According to the property valuations which we discuss above, the trial court awarded her approximately 70 percent of the estate assets in its division. In total, Carmen was awarded over 70 percent of the community estate. This is far from an equal division, and it significantly favored Carmen. Furthermore, the record shows the trial court's division follows Carmen's proposed division item for item, with only three exceptions.[10] Carmen has not carried her burden to show the trial court

abused its discretion.[11] Issue One is overruled.

In Issue Two, Carmen contends that the trial court also abused its discretion by failing to order Ismael to continue to pay spousal maintenance. She argues that, during their thirty-seven years of marriage, Ismael had been the more prominent provider, developing his career, while Carmen raised the couple's four children. She continues that, during the divorce hearing, she proved that her monthly expenses, including medical care and prescriptions, were over two thousand dollars a month more than her income. In conclusion, she argues that even considering the assets awarded to her in the property division, she cannot meet her reasonable minimum needs and therefore is entitled to spousal maintenance.

■■■ A trial court's award of, or failure to award, spousal maintenance is subject to an abuse of discretion review. *See Kennedy v. Kennedy,* 125 S.W.3d 14, 21 (Tex.App.-Austin 2002, pet. denied) (trial court's failure to award spousal maintenance to wife was not an abuse of discretion). The trial court may exercise its discretion to award post-divorce maintenance payments, only if the spouse seeking maintenance meets specific requirements. *See* TEX. FAM.CODE ANN. § 8.051; *Pickens v. Pickens,* 62 S.W.3d 212, 214–15 (Tex. App.-Dallas 2001, pet. denied).

■■ Carmen's petition sought spousal maintenance under section 8.051(2)(C) of the Texas Family Code.[12] In addition to the requirement that the marriage have lasted at least ten years, this section requires that the spouse (such as Carmen)

---

**10.** The two lots and the inoperative Honda.

**11.** In her brief to this Court, Carmen inaccurately states that the trial court's division awarded the section 401(k) CD conversion to Ismael. Under "Property to Wife," the divorce decree lists asset number W–8 as "CD

# 8610134051 with Wells Fargo Bank (401(k) conversion)."

**12.** Carmen's original petition for divorce specifically requests spousal maintenance because she "lacks sufficient property, including property that she would be requesting, which

seeking maintenance payments show that she lacks sufficient property, including property distributed incident to the divorce, to provide for her minimum reasonable needs and that she "clearly" lacks earning ability in the labor market adequate to provide support for such reasonable needs. TEX. FAM.CODE ANN. § 8.051(2)(C). Determining what the "minimum reasonable needs" are for a particular individual is a fact-specific determination, which must be made by the trial court on a case-by-case basis. *Smith v. Smith,* 115 S.W.3d 303, 306 (Tex.App.-Corpus Christi 2003, no pet.). Furthermore, the Texas Family Code presumes that spousal maintenance under section 8.051(2) is not warranted, unless the spouse seeking maintenance has exercised diligence in seeking suitable employment or developing the necessary skills to become self-supporting during the period of separation or the time the divorce is pending. TEX. FAM. CODE ANN. § 8.053(a).

Carmen testified that she suffered from several medical problems. She has high blood pressure, high cholesterol, asthmatic bronchitis, problems with her knee, and stomach problems, which require ongoing medical care. She also testified that she has "emotional problems" which forced her to retire. There is no evidence in the record to indicate that Carmen attempted to return to work during the period of separation, and the record does not contain an explanation of why her ailments prevent her from returning to work as a bookkeeper.

As we have already discussed, the trial court awarded Carmen significant assets in the property division, including her Vanguard retirement account, the Wells Fargo CD, the couple's home in El Paso, rental property, and half the net proceeds from the sale of the Clint and Timberon lots. In light of these assets, and the lack of evidence to overcome the statutory presumption, the trial court did not abuse its discretion when it declined to award spousal maintenance.[13] Issue Two is overruled.

Having overruled both of Appellant's issues, we affirm the trial court's judgment.

---

would provide for her minimum reasonable needs." She alleges further that she "is unable to earn an amount sufficient to be able to be self-sustaining." As she admits in her brief to this Court, she does not allege that she is unable to support herself through appropriate employment due to incapacity caused by a physical or mental disability, as required in section 8.051(2)(A).

13. Ismael's brief also addresses Carmen's requests that, in the event of a remand, this Court order the trial court to award her a greater proportion of the community estate and award her ongoing spousal maintenance in the amount of $2,500 per month. Because of our disposition of the case, we need not address Carmen's potential remedies on remand.